IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RYAN RUFF, CRUSOE GONGBAY,
and SAQWAN EDWARDS,

      Plaintiffs,

v.                                 No. 16-CV-1140 MCA/LF

BOARD OF REGENTS OF THE
UNIVERSITY OF NEW MEXICO,
et al.,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on *Defendants' Motion to Dismiss Plaintiffs'*
*Title IX Claim*. [Doc. 20] The Court, having considered the parties' submissions, the
relevant law, and otherwise being fully advised in the premises, hereby **GRANTS** the
*Motion* and further grants Plaintiffs leave to amend their complaint.

## BACKGROUND

Because this is a motion to dismiss pursuant to Federal Rule of Civil Procedure
12(b)(6), the Court sets forth the plausible factual allegations in Plaintiffs' *First Amended*
*Verified Complaint for Civil Rights Violations and State Tort Claims* [Doc. 11] (hereafter,
Complaint), accepts them as true, and grants all reasonable inferences the plausible
factual allegations allow. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

During the relevant period, Plaintiff Ryan Ruff was a student at Central New
Mexico Community College. [Doc. 11, ¶ 121] Plaintiffs Crusoe Gongbay and SaQwan

1

Edwards were students at the University of New Mexico (UNM) and were on UNM's football team. [Doc. 11, ¶¶ 127, 133, 670] All three Plaintiffs are African American men. [Doc. 11, ¶ 452] In April, 2014, Courtney Spencer, a white female student at UNM, accused all three Plaintiffs of sexually assaulting her. [Doc. 11, ¶ 19] Plaintiffs, however, allege that Spencer engaged in consensual sexual activity with all three of them and that there were witnesses and video evidence which showed that the sexual acts were consensual. [Doc. 11, ¶¶ 363, 369, 379, 380, 383, 386] Plaintiffs now sue the Board of Regents of the University of New Mexico, the Chief of Police of the UNM Police Department (UNMPD), and eight named UNMPD officers in their individual and official capacities. Plaintiffs generally allege that Defendants violated their constitutional rights, violated federal statutes, and committed various torts in conducting a deficient investigation and in pursuing criminal charges against them. [Doc. 11, ¶ 28] Plaintiffs bring eighteen causes of action, but this *Memorandum Opinion and Order* only addresses Count XVIII, Plaintiffs cause of action arising Title IX (20 U.S.C. § 1681(a)).

As pleaded by Plaintiffs, at some point in the late hours of April 12, 2014 or the early hours of April 13, 2014, Spencer reported to a resident advisor that she was "kidnapped and gang-raped by (3) three black men[] in the back seat of a small dark colored passenger vehicle." [Doc. 11, ¶¶ 109-111] The resident advisor contacted UNM authorities, and the UNM Police Department (UNMPD) began to investigate the alleged crime. [Doc. 11, ¶ 111] Shortly thereafter, Spencer met with a Sexual Assault Nurse Examiner and she gave a detailed statement to UNMPD officers. [Doc. 11, ¶ 113]

Plaintiffs allege that various statements by the Plaintiff were incorrect and inconsistent with other evidence available to UNMPD. Plaintiffs allege that evidence available to Defendants, but not collected, demonstrated that Spencer attended a gathering of 10 people (none of which were the Plaintiffs in this case) in a dorm room sometime after 9:00 p.m. on April 12, 2014. [Doc. 11, ¶ 343-44] At that gathering, several witnesses observed Spencer "engaging in stripping activities, partially unclothed lap dances, [] kissing of various party attendees[,]" and "groping the genitalia" of one of the attendees "during one of her provocative and lascivious 'lap dances.'" [Doc. 11, ¶¶ 345, 347, 348, 349] "One of the attendees even videotaped" Spencer groping an attendee during a lap dance. [Doc. 11, ¶ 348] This gathering disbanded by 11:30 p.m., and Spencer left with two of the male attendees of the gathering to attend an "off campus house party." [Doc. 11, ¶¶ 352, 353, 355, 356] On the way, Spencer offered to provide fellatio to one of the males, and did so briefly once the male parked his vehicle outside the house party. [Doc. 11, ¶¶ 357, 358] Thereafter, that male left the vehicle and Spencer the other male occupant "engaged in additional voluntary sexual acts, first engaging in [fellatio], which gravitated to unprotected sexual intercourse, in the back seat." [Doc. 11, ¶¶ 359, 360] Thereafter, Spencer and the male exited the vehicle, and then, outside the vehicle, "[a]ccording to numerous fact witness accounts, in the early morning hours of approximately 12:30 a.m. on April 13, 2014, Courtney Spencer for the first time[] encountered Plaintiffs Ruff, Gongbay, and Edwards, who were accompanied by [a] fact witness." [Doc. 11, ¶ 363]

Spencer "intercepted" the four men, who were walking to Plaintiff Ruff's vehicle, engaged in conversation and "lewd and suggestive behavior towards the Plaintiffs[,] including specific sexually charged comments directed at the Plaintiffs" and suggested that she wanted to go with them to Plaintiff Gongbay's residence because "she was 'bored.'" [Doc. 11, ¶¶ 366, 367] During this interaction, she also purportedly "groped the genitalia of Plaintiff Gongbay." [Doc. 11, ¶ 369] Plaintiffs allege that "proper investigation[] would have revealed that at approximately 12:45 to 1:15 a.m. on the morning of April 13, 2014, Courtney Spencer voluntarily entered the front passenger side of Plaintiff Ruff's BMW, voluntarily sitting on the lap of Plaintiff Edwards in the front passenger seat." [Doc. 11, ¶ 371] "While in the front seat of Plaintiff Ruff's BMW, Ms. Spencer disrobed to her underwear and gave Plaintiff Edwards a provocative and sexually charged 'lap dance[,]'" "'twerking' on Plaintiff Edwards, taking off her clothes and groping the Plaintiffs." [Doc. 11, ¶¶ 373, 374] One of the Plaintiffs recorded "Spencer's lewd and lascivious behavior [including the lap dance] on a cellular telephone in a [S]napchat video, showing the Plaintiffs and Ms. Spencer laughing and singing to the song 'Slutty-boy Gangbang,' a popular rap song by a Maryland hip-hop artist." [Doc. 11, ¶ 375] "After arriving at Plaintiff Gongbay's apartment, Ms. Spencer continued her provocative behavior by removing the remainder of her clothing, voluntarily engaging in erotic dancing, grinding on the Plaintiffs and offering sexual acts to Plaintiff Edwards." [Doc. 11, ¶ 378] "Plaintiff Edwards accepted Ms. Spencer's offer and the two engaged in voluntary consensual sex within the Gongbay residence." [Doc. 11, ¶ 379] "Albeit distasteful, one of the Plaintiffs recorded Ms. Spencer's sexual act in the Gongbay

4

apartment in a [S]napchat video, including but not limited to her voluntarily engaging in oral and vaginal sex with Plaintiff Edwards." [Doc. 11, ¶ 380]

> This [Snapchat] video documented that Ms. Spencer was the aggressor during the sexual interlude with Plaintiff Edwards, showing Ms. Spencer on top of Plaintiff Edwards while [per]forming fellatio as Plaintiff Edwards smiled to the camera. Further, while in the missionary position, Ms. Spencer was recorded pulling Plaintiff Edwards onto her on several occasions.

[Doc. 11, ¶ 381]

Thereafter, at some time before 3:00 a.m. on April 13, 2014, Plaintiff Ruff offered to take Spencer back to her dorm, and she agreed. [Doc. 11, ¶ 384] "Ms. Spencer complained to Plaintiff Ruff that . . . 'she had not been sexually satisfied' that evening and asked Plaintiff Ruff to pull the car over in a [parking] lot at her dormitory. Plaintiff acquiesced and the two engaged in sexual intercourse in Plaintiff Ruff's car." [Doc. 11, ¶ 385] "During their sexual interlude, Plaintiff Ruff's vehicle was parked at the Casa Del Rio Dorms in full view of numerous video cameras on that campus. While parked, Ms. Spencer proceeded to take Plaintiff Ruff's pants off and performed oral sex on him, which was followed by voluntary consensual sexual intercourse." [Doc. 11, ¶ 386] Thereafter, Spencer began searching around in Plaintiff Ruff's vehicle for her cell phone and purse. Plaintiffs allege Spencer forgot the items at the dorm room of the initial social gathering. [Doc. 11, ¶¶ 389, 395] In searching the vehicle, she grabbed Plaintiff Ruff's "legally registered handgun," thus potentially leaving her fingerprints on the gun. [Doc. 11, ¶¶ 391, 392] Spencer left the vehicle, and that time was "noticeably upset at Plaintiff

Ruff, since she could not locate her purse or phone and complained that the items were still in" his vehicle.  [Doc. 11, ¶ 395]

Plaintiffs allege that it was "apparent that there were numerous inconsistencies in [Spencer's] reported story, which should have been obvious to a well-trained, experienced, proficient and unbiased investigator."  [Doc. 11, ¶ 114]  However, Plaintiffs allege that the UNMPD officers working on the case "were either[] untrained; grossly undertrained; and/or failed to follow standard operating procedures (S.O.P's) for the proper investigation of sexual assaults."  [Doc. 11, ¶ 318]  Defendants UNMPD officers "were directed [by UNM] to conduct their criminal investigation, intentionally targeting the three African American Plaintiffs alleged to be involved in the crime."  [Doc. 11, ¶ 115]  Accordingly, during the week following the alleged assault, "[d]espite having early knowledge of crucial and important details, . . . [including] the location of the alleged crime, details of the facts and the location of important evidence[], Defendants knowingly and intentionally failed to identify important witnesses and/or secure valuable evidence."  [Doc. 11, ¶ 116]  Plaintiffs assert that Defendants failed to obtain, preserve, and review surveillance video footage, failed to secure statements, and allowed witnesses to disappear.  [Doc. 11, ¶¶ 632, 635]  Moreover, according to Plaintiffs, Defendants built a criminal case against Plaintiffs, "knowing that [Plaintiffs] were *innocent* and that probable cause did not support arrest or prosecution."  [Doc. 11, ¶ 118]

On April 21, 2014, UNMPD filed criminal complaints and obtained arrest warrants for Plaintiffs Ruff and Gongbay.  [Doc. 11, ¶¶ 121, 123, 127, 128]  On April 29, 2014, Plaintiff Edwards was "wrongfully detained and arrested" by UNMPD.  [Doc. 11,

¶ 133]  All three plaintiffs adamantly denied the charges and proclaimed their innocence. [Doc. 11, ¶¶ 126, 132, 137]

On April 25, 2014, Plaintiff Edwards submitted DNA to UNMPD pursuant to a warrant.  [Doc. 11, ¶ 158]  There is an audio recording of an exchange between various UNMPD officers after the DNA collection was completed and Edwards left the room. [Doc. 11, ¶ 158]  During the exchange, Defendant Guevara, the lead investigator of the case, stated:[1]

> But it's all Crusoe.  It's all Crusoe, it's none of these other guys, you know. . ."  "But, [i]f we can put them all together, especially Crusoe. . . . If Crusoe's got several charges over his head, that guy's going to sing like a bird.  They all know him by name."

[Doc. 11, ¶¶ 142, 273]  In another exchange between the officers, an unidentified officer stated "You guys are just trying to railroad these guys, man. . ." to which another unidentified officer stated "'Yeah, well, we made him get Paul Kennedy, right?' [Officer SINGING] 'That's how we do it [']round[] here. . .'"  [Doc. 11 ¶¶ 202-206]  Defendant Guevara also stated that this case was going to be the biggest case he had ever done, his "Everest," and that he always wanted a "big fucking case with high big dollar attorney stuff, and let's get in the fucking ring and get it on."  [Doc. 11, ¶¶ 231, 255]  Plaintiffs allege that these statements show that "Defendant UNMPD Officers knew and/or had reason to believe that at least two of the Plaintiffs[] (Ryan Ruff and SaQwan Edwards) were *innocent*, but Defendants moved forward pursuing criminal charges" against them

---

[1]  The Court sets out the alleged statement as set forth in the complaint, including the ellipses and quotation marks.  It is unclear to the Court whether statements are omitted from this recitation.

anyway. [Doc. 11, ¶ 288] Plaintiffs also allege that these statements demonstrate that Defendants UNMPD Officers acted out of "racial animus." [Doc. 11, ¶ 158]

Plaintiffs allege that their counsel provided exculpatory video evidence to the district attorney. [Doc. 11, ¶ 296] However, even after Officer Guevara had the video evidence, he continued to pursue the allegations against Plaintiffs, by interviewing Spencer and suggesting to her that she was mistaken about details in the video, thus attempting to influence her to "alter her previous testimony." [Doc. 11, ¶¶ 296-310]

Plaintiffs were charged with kidnapping and criminal sexual penetration, but the charges against them were eventually dismissed by *Nolle Prosequi.* [Doc. 11, ¶¶ 121, 127, 133, 644] Nonetheless, prior to the conclusion of the criminal investigation, UNM indefinitely suspended Plaintiffs Gongbay and Edwards from playing football [Doc. 11, ¶¶ 667] and indefinitely banned Ruff from its campus. [Doc. 11, ¶ 668] A separate disciplinary proceeding investigation was conducted by UNM's Office of Equal Opportunity contemporaneous to the criminal investigation. [Doc. 11, ¶ 408] Ultimately, that investigation found that there was "no credible or actionable evidence" against Plaintiffs Gongbay and Edwards (the UNM students). [Doc. 11, ¶ 410]

Plaintiffs allege various motives behind Defendants' continued pursuit of criminal charges against Plaintiffs, even after Defendants knew or should have known of evidence of Plaintiffs' innocence.[2] Plaintiffs allege:

---

[2] There are dozens of repetitive, often conclusory allegations within the 671 paragraph, 110 page *First Amended Verified Complaint.* [Doc. 11] These repetitive and conclusory allegations make it difficult for the Court to ascertain and determine the basis for the Title

- Prior to the incident which forms the basis of this lawsuit, the University of New Mexico and its police force faced numerous complaints from its[] student body that the University failed to respond adequately to innumerable reports of sexual assaults. [Doc. 11, ¶ 2; Doc. 27, p. 4]

- The student body complaints were widely reported by local media outlets, which in part, prompted a United States Department of Justice (hereinafter, "DOJ") investigation into the University of New Mexico. These complaints were the source of immense concern and great embarrassment for the University and its[] police department. [Doc. 11, ¶ 3; Doc. 27, p. 4]

- The student body complaints threatened a lucrative revenue stream involving admission interest in the University; the DOJ investigation threatened the continuation of the University's lucrative public funding from the Federal Government for its[] Title IV and Title IX programs; and the overwhelmingly negative media exposure immediately and continually threatened the respectability and viability of the University's police force and further threatened the livelihood of its[] police force. [Doc. 11, ¶ 5; Doc. 27, p. 4]

- Defendants UNM and UNM Police Department actively discriminated against Plaintiffs on the basis of sex by failing to properly, timely and/or adequately investigate claims of sexual assault made against them by a female student, and failing to afford them the same degree of access to investigation materials, discovery, equal protection of the law, and due process of law. [Doc. 11, ¶ 662; Doc. 27, p. 5]

- Defendant UNM[ and] UNMPD . . . failed in their investigative process and procedures to thoroughly or adequately interview the (3) three innocent male Plaintiffs, instead opting to take the testimony of the female student, accuser, Courtney Spencer, as undeniable truth. [Doc. 11, ¶ 663; Doc. 27, p. 5]

- Defendants UNM[ and] UNMPD . . . actively discriminated against the male Plaintiffs by deliberately, willfully, wantonly and maliciously ignoring numerous inconsistent statements made by the

IX Claim, and thus, the Court relies to a large extent on Plaintiffs' identification of the pertinent allegations in their response to the *Motion to Dismiss*. [Doc. 27]

female accuser, and failed to procure video evidence which greatly called into question Courtney Spencer's accusations and detailed accounts of the alleged incident. [Doc. 11, ¶ 665; Doc. 27, p. 5]

- Defendant University of New Mexico and Defendant Board of Regents of the University of New Mexico by and through its[] athletic department actively engaged in sex-based discrimination against the innocent African American male Plaintiffs by suspending two Plaintiffs from the UNM Football program indefinitely, prior to the conclusion of Defendant University of New Mexico's investigation of the alleged criminal sexual assault charges wrongfully levied against Plaintiffs. [Doc. 11, ¶ 667; Doc. 27, p. 5]

Plaintiffs allege that Defendants wrongfully sought to indict and convict Plaintiffs for "nefarious" purposes, including: "motivation to appease [the] student body" given several complaints of inadequate investigations of alleged sexual assaults; motivation to "appease the Department of Justice (DOJ)"; motivation to "secure [UNM's] lucrative funding"; motivation to "foster confidence in [UNM's] police force"; and "UNMPD Commanders and Supervisors sought to achieve notoriety and acclaim for its[] Police department and its[] officers sought individual personal accolades and notoriety by their involvement in the successful indictment, prosecution and conviction of a highly publicized criminal case." [Doc. 11, ¶¶ 27, 37-38] The Complaint suggests that the DOJ investigation was either initiated before or "[a]t the time of [the] investigation" into Spencer's allegations. [Doc. 11, ¶¶ 3-7, 319]

**ANALYSIS**

### *Standard Governing a Motion to Dismiss pursuant to Rule 12(b)(6)*

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to set out "a short and plain statement of the claim showing that the pleader is entitled to relief." Federal Rule

of Civil Procedure 12(b)(6) allows a defendant to file a motion to dismiss for "failure to state a claim upon which relief can be granted."  In *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), the Supreme Court adopted the following test governing Rule 12(b)(6) motions to dismiss:  "to withstand a motion to dismiss, a complaint must have enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'"  *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  The Court accepts as true all "plausible, non-conclusory, and non-speculative" facts alleged in the plaintiff's complaint, *Shrader v. A1 Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011) (internal quotation marks and citation omitted); provided that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.  In short, in ruling on a Rule 12(b)(6) motion, "a court should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable."  *Collins*, 656 F.3d at 1214.

### Plaintiffs' Title IX Claims Against the Individual Defendants

As relevant here, Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  "Courts have generally assessed Title IX

discrimination claims under the same legal analysis as Title VII claims." *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001). This includes application of the *McDonnell Douglas* burden-shifting framework. *See id.* (reviewing district court's application of *McDonnell Douglas* test to Title IX claim without assessing whether such application was appropriate); *Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1315 n.8 (10th Cir. 2017) (stating that "[t]he *McDonnell Douglas* framework applies both to the Title IX and Title VII sex discrimination claims").

As pleaded, Plaintiffs bring their Title IX claim against all Defendants. [Doc. 11, p. 105] Defendants argue, and Plaintiffs do not dispute, that Title IX does not authorize a cause of action against individual defendants. [Doc. 21, p. 6] "Title IX reaches institutions and programs that receive federal funds, 20 U.S.C. § 1681(a), which may include nonpublic institutions, § 1681(c), but it has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009). "Accordingly, the separate liability of the supervisory officials at the University must be established, if at all, under section 1983, rather than under Title IX." *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 901 (1st Cir. 1988). Thus, the Court will **DISMISS** the Title IX claims against all individual Defendants in their individual capacities.

### Plaintiffs' Title IX Claim Against the Board of Regents

### Evidentiary Matter

Prior to addressing the merits of Plaintiffs' Title IX claim against the Board of Regents, the Court must address an evidentiary matter. Plaintiffs' *Amended Complaint* leads the reader to believe that the Department of Justice was investigating UNM's handling of sexual assault cases at the time Spencer accused Plaintiffs of sexually assaulting her. [Doc. 11, ¶¶ 2, 3, 319] However, in their *Memorandum* on their *Motion to Dismiss Plaintiffs' Title IX Claim*, Defendants submit, without providing documentary evidence, that "Plaintiffs were accused of sexual assault . . . in April 2014"; the criminal investigation of Plaintiffs concluded in July 2014, and the DOJ "did <u>not</u> initiate its investigation of UNM until December 2014." [Doc. 21, p. 3 n.2] Plaintiffs do not expressly address this contention in their *Response*. Nonetheless, they rely heavily on pressure from the DOJ investigation in crafting their Title IX argument. For example, they argue that

> Based upon increasing negative media coverage of the University's mishandlings of reported campus sexual assaults, coupled with the Department of Justice's . . . investigation into the University, Defendants UNM and the Board of Regents came to the conclusion that these three young black citizens were convenient patsies, and worthy sacrifices, in pursuit of their malicious goals: [including] to get the DOJ and the Federal Government off their backs and stave off further federal investigation[.]

[Doc. 27, pp. 1-2] Further, Plaintiffs point the Court to their allegations which imply that the DOJ investigation was occurring at the time Spencer made the allegations against Plaintiffs. [Doc. 27, p. 4 (citing Doc. 11, ¶¶ 2, 3, 5] On the other hand, Plaintiffs later argue that "Defendants were overwhelmingly influenced by the pressure of impending

DOJ investigations."[3]   [Doc. 27, p. 11]   Defendants reply by attaching documents showing that the district attorney dismissed charges against the Plaintiffs in June of 2014 and a letter from the DOJ dated December 5, 2014, notifying UNM that the DOJ was initiating an investigation into UNM's handling of sexual assault claims.  [Doc. 37, pp. 5-6; Doc. 37-1, pp. 1-3, 7-8]  Defendants also submit that Plaintiffs were aware at the time they filed their *Complaint* that the DOJ investigation did not begin "until after UNMPD had already completed its criminal investigation," and thus Defendants argue that the "Court would be acting well within its discretion in ordering Plaintiffs' counsel to show cause why [Federal Rule of Civil Procedure] 11 sanctions should not be imposed based on their false allegations of fact."  [Doc. 37, p. 6 n.3]

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).  If the Court converts a motion to dismiss into a motion for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  *Id.* Here, the Court will not consider the documents presented by Defendants in their Reply brief.  For reasons set forth later in this opinion, the Court will allow Plaintiffs leave to amend their Complaint.  Thus, Plaintiffs will have the opportunity to correct any factually inaccurate allegations.  In revising their allegations, the Court points counsel not only to Rule 11 but also to 28 U.S.C. § 1927, which this Court understands to allow sanctions for

---

[3] In neither their *Complaint* nor their *Response* do Plaintiffs allege how Defendants were aware that there was an impending DOJ investigation.

continued reliance on a factually false allegation once the party or attorney is made aware that such allegation is false.  28 U.S.C. § 1927 ("Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."); NMRA 16-303(A)(1) ("A lawyer shall not knowingly: . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer").  If, after Plaintiffs amend their complaint, Defendants believe there is a basis for requesting relief under either Rule 11 or Section 1927, the Court grants leave for the Defendants to do so.

### Merits of the Title IX Claim as Pled

Plaintiffs submit that they are making what is known as an "erroneous outcome claim" under Title IX.[4]  *See Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2nd Cir. 1994)

---

[4] Some Courts have identified up to four types of Title IX claims arising from disciplinary hearings:  erroneous outcome, selective enforcement, deliberate indifference, and archaic assumptions.  *See Stenzel v. Peterson*, 2017 WL 4081897, at *4 (D. Minn. Sept. 13, 2017) (describing four theories of Title IX liability arising from a campus disciplinary proceeding); *see also Doe v. Univ. of Colo. Boulder*, __ F. Supp. 3d __, 2017 WL 2311209 at *7 (D. Colo. May 26, 2017) (describing two theories, or "evidentiary templates," of Title IX liability arising from a campus disciplinary proceeding).  Plaintiffs did not identify in their complaint their theory of Title IX liability, and thus, Defendants guessed that Plaintiffs were making a selective enforcement claim and analyzed the case as such in their opening *Memorandum*.  [Doc. 21]  However, in their *Response*, Plaintiffs submit that they are making an erroneous outcome claim.  If Plaintiffs were making a selective enforcement claim, the Court would conclude that their *Complaint* is insufficient to state such a claim as it only makes conclusory allegations that Defendants treated Spencer different than them, and moreover Plaintiffs failed to identify an actual comparator, i.e., a female who was accused of sexual assault.  *See Mallory v. Ohio Univ.*, 76 Fed. App'x 634, 641 (2003) (unpublished decision) (stating that a person alleging

(defining an erroneous outcome as a basis for bringing a Title IX challenge to a disciplinary action). While many Courts have applied the "erroneous outcome" test, our Tenth Circuit has not passed on whether an "erroneous outcome" claim is allowed by Title IX. Nonetheless, Courts within the Tenth Circuit have applied the analysis. *See Doe v. Univ. of Colo. Boulder,* __ F. Supp. 3d __, 2017 WL 231129 at *7-8 (D. Colo. May 26, 2017); *Ritter v. Okla. City Univ.*, 2016 WL 3982554 at *1-2 (W.D. Okla. July 22, 2016). Defendants do not argue that our Tenth Circuit would not adopt the "erroneous outcome" analysis and thus, the Court will assume that our Tenth Circuit would decide that Title IX includes such a claim.

"A successful erroneous outcome claim requires the plaintiff to show that the outcome of the University's disciplinary proceeding was erroneous because of sex bias." *Doe v. Cummins*, 662 Fed. App'x 437, 452 (6th Cir. 2016) (unpublished decision) (internal brackets, quotation marks, and citation omitted). Thus, "to state an erroneous-outcome claim, a plaintiff must plead: (1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding[,] and (2) a particularized causal connection between the flawed outcome and gender bias." *Id.* at 451 (internal ellipses, quotation marks and citation omitted).

Evidence demonstrating an erroneous outcome can include a "particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense," "procedural

selective enforcement "must demonstrate that a [comparator of the opposite sex] was in circumstances sufficiently similar to his [or her] own and was treated more favorably by the University").

flaws affecting the proof," or another "reason to doubt the veracity of the charge." *Yusuf*, 35 F.3d at 715. Nonetheless, "Title IX to impair the independence of universities in disciplining students against whom the evidence of an offense, after a fair hearing, is overwhelming." *Id.* "It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion." *Plummer v. Univ. of Houston*, 860 F.3d 767, 772 (5th Cir. 2017) (internal quotation marks and citation omitted).

Evidence demonstrating causation between the flawed outcome and a gender bias can be shown, for example, by "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Cummins*, 662 Fed. App'x at 452 (internal quotation marks and citation omitted). "[A]llegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss." *Yusuf*, 35 F.3d at 715. Finally, *Yusuf* required that the Plaintiff prove that sex was a "motivating factor," rather than the but for cause of the erroneous outcome of the disciplinary proceeding, *Yusuf*, 35 F.3d at 715, and this Court will apply the motivating factor test. However, the Court notes that neither our Tenth Circuit nor the Supreme Court has stated whether, in making a Title IX claim, the Plaintiff must prove that sex was the motivating factor or the but for cause of the challenged action or outcome.

Defendants challenge both elements of the erroneous outcome theory: 1) that there was an erroneous outcome, and 2) that the purported erroneous outcome was due to

Plaintiffs' gender. [Doc. 37, pp. 2-3] Defendants point out that Plaintiffs have not alleged that they were ever found by UNM to have committed any offense, nor were they ever disciplined by UNM.[5] [Doc. 37, p. 2] Though there was not a disciplinary proceeding, Plaintiffs do allege that UNMPD filed criminal complaints against them absent probable cause, caused Plaintiffs to be arrested, and submitted a 28 page report to the district attorney's office which was skewed because UNMPD failed to properly investigate the claim and left out exculpatory evidence.[6] [Doc. 11, ¶¶ 60, 65, 398, 666] While Plaintiffs point to no authority directly on-point, the Court believes that these allegations are sufficient to demonstrate an erroneous outcome.

Defendants further argue that Plaintiffs have not alleged facts demonstrating a causal connection between Plaintiffs' sex and the alleged erroneous outcome. [Doc. 37, p. 3] While the circumstances of the cases vary, there is arguably a split in authority with regard to whether certain facts pertaining to particular pressures on a University are sufficient to allege discriminatory intent, i.e., gender bias, in Title IX discipline cases. On the one hand, there are several cases which hold that a "pro-female, anti-male bias" can be alleged by pointing to "pressures" from, for example, a student body critical of a University's handling of sexual assault cases, or a letter, known as the "Dear Colleague"

_____

[5] Defendants do not address Plaintiffs' suspension from playing football (Gongbay and Edwards) or banishment from campus (Ruff).

[6] Defendants also argue that they have found no case law indicating that a Title IX claim can arise out of a criminal investigation conducted by a university police department, and that "[i]t is doubtful a viable Title IX claim can arise from an underlying criminal investigation." [Doc. 37, p. 2 n.2] However, Defendants make this argument in a footnote in their *Reply* brief. The Court will allow future briefing on this issue to give Plaintiffs an opportunity to respond to this argument. Plaintiffs may address this argument in their amended complaint.

Letter,"[7] sent by the Department of Education's Office for Civil Rights [DOE and OCR, respectively) to institutions regarding appropriate procedures for investigating claims of sexual assault. *See, e.g., Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2nd Cir. 2016) (holding that the plaintiff pleaded "sufficient specific facts giving at least the necessary minimal support to a plausible inference of sex discrimination" by alleging that the defendant was motivated to "refute criticisms circulating in the student body and in the public press that Columbia was turning a blind eye to *female students*' charges of sexual assaults by male students" (emphasis added)); *Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 747751 (S.D. Ohio 2014) (holding that allegation, *inter alia*, that accused was made a "scapegoat" to appease the DOE OCR after two previous investigations for inadequately handling sexual assault cases was sufficient to gender bias pursuant to Title IX).[8] On the other hand, many cases conclude that allegations of "pressure from the federal government to investigate sexual assault allegations more aggressively" is insufficient to allow an inference of bias. *See, e.g., Univ. of Colo., Boulder*, 2017 WL 2311209 at * 8,

---

[7] The "Dear Colleague Letter" has been described as "guidance on complying with Title IX" and encouraging "schools to adopt a preponderance standard of proof, allow appeals for both parties, and minimize the burden on the complainant when investigating sexual-assault allegations." *Cummins*, 662 Fed. App'x at 438-39 (internal quotation marks omitted).

[8] Plaintiffs also ask the Court to rely on a Magistrate Judge's *Recommendation on Motions to Dismiss*, which was never adopted. *Neal v. Colorado State University-Pueblo*, 2017 WL 633045, at *12 (D. Colo. Feb 16, 2017) (concluding that collection of facts were sufficient to allege gender bias, including procedural shortcomings caused by pressure from the Dear Colleague Letter and "DOE/OCR's enforcement of the 2011 [Dear Colleague Letter] has become gender-skewed against men, or has become widely understood by schools as such," as well as communications evidencing the university's "inclination to favor female students alleging sexual misconduct over male students who are accused"). Though this *Recommendation* has no legal or precedential value, the Court has read it and considered its reasoning.

11 (concluding that allegations, including that "the University was, at the time of the allegations against [the plaintiff], subject to a Department of Education investigation into the University's handling of sexual violence and sexual harassment complaints" and that the investigation "motivated Defendants to handle the case against Plaintiff more aggressively, and to protect the reputation and financial well-being of [the University]" were conclusory and insufficient to allow an inference of gender bias; stating that a majority of cases "have held that *Yusuf*-like pleading of the gender bias component no longer passes muster [post-*Iqbal*], and that the various plaintiffs' allegations largely tend to show, if anything, pro-victim bias, which does not equate to anti-male bias"); *Cummins*, 662 Fed. App'x at 452 (concluding that allegation that, "in order to appease the Department of Education," in response to the "Dear Colleague Letter," a university "adopted a practice of investigation and enforcement under Title IX that is inherently biased against male students accused of sexual assault" was "unfounded" and "conclusory"); *see also Austin v. Univ. of Oregon*, 205 F. Supp. 3d 1214, 1219, 1224, 1225-26 (D. Oregon 2016) (holding that plaintiffs failed to plead claims giving rise to an inference of gender discrimination by alleging that university president stated in press conference, prior to the review process, that one student would not play basketball for the university, proceeding with review process though district attorney did not criminally prosecute the plaintiffs, and university had not taken action against any female student for either similar sexual misconduct or for false allegations; stating "[i]f anything, Plaintiffs have alleged that the University is biased against alleged perpetrators of sexual

misconduct, but that does not implicate gender discrimination simply because those alleged perpetrators are typically male").

In this case, Plaintiffs have not pleaded factual allegations sufficient to allow an inference that their sex was a motivating factor in either the alleged erroneous outcome or the alleged procedural defects even under the standards applied by most of the cases upon which Plaintiffs rely. *See Columbia Univ.*, 831 F.3d at 57 (concluding that allegations were sufficient to allege gender bias where, prior to the plaintiff's disciplinary proceeding, the President of the University had "called a University-wide open meeting with the Dean" to discuss substantial criticism of the University by the students and the press for "not taking seriously complaints of female students alleging sexual assault by male students"); *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 768 (D. Md. 2015) (concluding that allegations were sufficient to allege gender bias where plaintiffs alleged that the University "possesse[d] communications evidencing [the university's] intent to favor female students alleging sexual assault over male students like Plaintiffs who are accused of sexual assault" in addition to the allegation that the university's actions were "taken to demonstrate to the United States Department of Education and/or the general public that Defendants are aggressively disciplining male students accused of sexual assault" (internal quotation marks omitted)); *Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 189 (D. R.I. 2016) (concluding that allegations were sufficient to allege gender bias where University employees made statements indicating a pro-female bias, including that the University "loaded the dice against the boys" and considered male students "guilty, until proven innocent"); *Ritter*, 2016 WL 3982554 at *2 (concluding that there was

sufficient evidence of gender bias based on allegations that "females facing comparable disciplinary charges have been treated more favorably than plaintiff and . . . that, because of [Plaintiff's] gender, the sanctions imposed on plaintiff were disproportionate to the severity of the charges levied against him"); *Neal*, 2017 WL 633045 at \*12 (recommending the conclusion that the Plaintiff sufficiently alleged gender discrimination where the plaintiff alleged that the DOE's "enforcement of the 2011 [Dear Colleague Letter] has become gender-skewed against men, or has become widely understood by schools as such," that the University was pressured by the skewed enforcement "to slant the procedures against Plaintiff so as to demonstrate to DOE/OCR that it would find accused men—not just accused persons of any gender—responsible for sexual misconduct and impose sanctions," and that there were communications by the university which demonstrated its "inclination to favor female students alleging sexual misconduct over male students who are accused"); *but see Yusuf*, 35 F.3d at 716 (holding that allegations of gender bias, under the *pre-Iqbal* standard of pleading, were sufficient, where the plaintiff alleged that a "false and somewhat stale charge of sexual harassment was made against him only after he pursued criminal charges for a brutal assault by the complainant's boyfriend" and that the University historically and systematically found males guilty of sexual harassment "regardless of the evidence, or lack thereof"); *Wells,* 7 F. Supp. 3d at 747, 751 (holding that allegations of gender bias were sufficient where Plaintiff alleged that the DOE OCR had twice investigated the university for mishandling sexual assault allegations by women, and thus the president of the university intended to make the plaintiff a "scapegoat so as to demonstrate a better response to sexual assault").

The Court concludes that to allege that gender bias affected the outcome of their proceeding, Plaintiffs must allege some fact or facts demonstrating that outside pressure actually influenced UNM, not just to aggressively pursue sexual assault cases, but to do so in a manner biased against males. Plaintiffs fail to plead such factual allegations. Plaintiffs' allegation of gender discrimination in this case are wholly conclusory. Plaintiffs allege that there were "numerous complaints from [UNM's] student body that the University failed to respond adequately to innumerable reports of sexual assaults," that these complaints "were widely reported by local media outlets," and that the University was faced with a DOJ investigation which threatened the UNM's federal funding. [Doc. 11, ¶¶ 2-5] Thus, Plaintiffs allege that UNM was motivated "to appease the Department of Justice; appease the University of New Mexico's student body; and achieve acclaim and notoriety for the University's police department" when handling the allegations in this case, in order successfully prosecute and convict "a highly publicized sexual assault case." [Doc. 11, ¶ 7] However, these allegations may support an inference of a lawful pro-victim bias, but they do not support an inference of unlawful gender bias. *See Univ. of Colo., Boulder*, 2017 WL 2311209 at *11 (holding that allegation of outside pressure to pursue sexual assaults did not demonstrate that University held a gender bias). Further, while Plaintiffs allege that the University had "nefarious goals" of "instill[ing] confidence in the University's student body; the general public; and the Federal Government that the University of New Mexico and its police force in fact, properly investigated all reports of sexual assaults and that its[] police force did so in a professional and proficient manner," these stated goals are neither nefarious nor

demonstrate a gender bias. [Doc. 11, ¶¶ 10-11] Finally, Plaintiffs make no allegations allowing an inference that UNM held or employed a gender bias in this case. For example, Plaintiffs do not allege that UNM officials or the deciding officials in this case made statements indicating a pro-female bias, or that UNM officials did not take complaints of sexual assault or harassment by male victims seriously, or UNM applied a different burden of proof or different procedures depending on whether the accused was male or female. While Plaintiffs allege that UNMPD failed to scrutinize the "the accuser's ever changing and inconsistent accounts" [Doc. 11, ¶ 30], and they took "the testimony of the female student, accuser, Courtney Spencer, as undeniable truth" [Doc. 11, ¶ 663] Plaintiffs have alleged no facts allowing an inference that Defendants did so because the accuser is female or because Plaintiffs are male. Further, without specific factual support, Plaintiffs allege in a conclusory fashion that they were not interviewed and were denied the opportunity given to their female accuser "to properly defend themselves against the charges levied against them." [Doc. 11, ¶ 664] However, because Plaintiffs were the subject of a criminal investigation, the failure to interview Plaintiffs and ask them to waive their rights against self-incrimination does not allow an inference of gender bias. Thus, Plaintiffs fail to allege that the University succumbed to pressure to pursue a criminal case against Plaintiffs due to their sex, rather than due to the serious nature of the allegations of a sexual assault or rather than a pro-victim bias.

The Court notes that Defendants make an argument, in a footnote, that Plaintiff Ruff, who was not a UNM student, was not denied participation in or the benefits of any educational program or activity when he was banned from the University of New

Mexico. [Doc. 21, p. 5 n.3] Plaintiffs do not cite any case law in making this argument. If Defendants wish to pursue this argument further, they are advised to more completely argue this issue in later briefing.

For the foregoing reasons, the Court **GRANTS** *Defendants' Motion to Dismiss Plaintiffs' Title IX Claim*. [Doc. 20]

**CONCLUSION**

**WHEREFORE,** for the foregoing reasons, the Court **GRANTS** *Defendants' Motion to Dismiss Plaintiffs' Title IX Claim*. [Doc. 20] However, the Court grants Plaintiffs leave to amend their *Complaint* in order to correct the deficiencies addressed in this *Memorandum Opinion and Order*. However, as two other *Motions to Dismiss* remain pending, the Court will set a deadline for Plaintiffs to amend their *Complaint* when the Court addresses the final *Motion to Dismiss*.

**SO ORDERED** this 30th day of September, 2017 in Albuquerque, New Mexico.

_____
M. CHRISTINA ARMIJO
Chief United States District Judge